UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**MARK ATHEY,**

       **Plaintiff,**          **CIVIL ACTION NO. 13-cv-12528**

       **v.**              **DISTRICT JUDGE MATTHEW F. LEITMAN**

**COMMISSIONER OF**        **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

       **Defendant.**
_____/

### REPORT AND RECOMMENDATION

Plaintiff Mark Athey seeks judicial review of Defendant Commissioner of Social Security's determination that he is not entitled to social security benefits for his physical and mental impairments under 42 U.S.C. § 405(g). (Docket no. 1.) Before the Court are Plaintiff's Motion for Summary Judgment (Docket no. 12) and Defendant's Motion for Summary Judgment (Docket no. 16). Plaintiff filed a Response to Defendant's Motion. (Docket no. 17.) The motions have been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). (Docket no. 3.) The undersigned has reviewed the pleadings, dispenses with a hearing pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), and issues this Report and Recommendation.

**I.      RECOMMENDATION**

The undersigned recommends that Plaintiff's Motion for Summary Judgment (Docket no. 12) be DENIED and that Defendant's Motion for Summary Judgment (Docket no. 16) be GRANTED.

## II.     PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability and disability insurance benefits with a protective filing date of October 21, 2010, alleging disability beginning April 30, 2010, due to lower back deterioration, arthritis, a herniated cervical disc, plantar fasciitis, depression, social anxiety, asthma, angina, hearing loss, and nerve damage in his leg. (*See* TR 19, 167.) The Social Security Administration denied Plaintiff's claims on February 16, 2011, and Plaintiff requested a *de novo* hearing. (TR 19.) On January 25, 2012, Plaintiff appeared with a representative and testified at the hearing before Administrative Law Judge (ALJ) Craig R. Petersen. (TR 19, 31.) In a February 9, 2012 decision, the ALJ found that Plaintiff was not entitled to benefits because he was capable of performing a significant number of jobs in the national economy. (TR 19-31.) The Appeals Council declined to review the ALJ's decision (TR 1-6), and Plaintiff commenced this action for judicial review. The parties then filed cross motions for summary judgment, which are currently before the Court.

## III.    HEARING TESTIMONY AND MEDICAL EVIDENCE

### A.     Plaintiff's Testimony

Plaintiff was 53 years old at the time of the administrative hearing and 51 years old at the time of alleged onset. (TR 25, 41.) Plaintiff testified that he separated from his wife in 2011 and that he was currently living in a house with his mother. (TR 42.) Plaintiff stated that he had not earned an income since April of 2010 and that he was not currently working. (TR 43, 45.) He admitted that he had a driver's license and that there were no health restrictions on his ability to drive. (TR 43.) Plaintiff added that his wife had driven him to the hearing that day. (TR 43.) Plaintiff testified that he graduated from high school, at which he took a combination of regular and special education classes, but had no vocational training. (TR 43-44.) Plaintiff stated that he

2

attended Delta College after high school for civil engineering, but did not graduate or obtain a degree or certificate. (TR 44.) Plaintiff admitted that he can read a newspaper, add and subtract simple numbers, and make change with a store cashier. (TR 44.)

Plaintiff confirmed that his disability began on April 30, 2010, when he fell into a deeper depression, and that he had not worked since that date. (TR 45-46.) Plaintiff admitted that he was not subject to any physical restrictions by a doctor when he last worked, nor did a doctor take him off of work. (TR 46.) Plaintiff stated that the last place he worked was at the City of Midland. (TR 46.) He elaborated that he had been a building maintenance supervisor at the Grace A. Dow Memorial Library for ten years up until February of 2010, in which he was demoted to a custodian due to budget cuts. (TR 47). He claimed that, as a building maintenance supervisor, he supervised three full-time employees and one part-time employee in the 100,000 square foot, three-floor building. (TR 47-48.) Plaintiff testified that his job responsibilities were to follow up with the other custodians, meet with contractors, sign and deliver his subordinates' time cards to the payroll department, and train his subordinates and that it took him about six months to learn those responsibilities. (TR 48, 49.) He added that his position required him to lift up to 100 pounds, spend most of the work day on his feet, and perform simple electric and plumbing tasks. (TR 48, 49.)

Plaintiff testified that he was suspended and later fired from his custodian position with the City of Midland because he was investigated for and pled guilty to theft of a City boiler. (TR 70-71.) He explained that in April of 2010, Plaintiff and another person moved a boiler, which weighed about two hundred pounds, out of his building and into the dumpster area. (TR 70.) Plaintiff claimed that he took it because he thought that it was just a used boiler that the City was tossing out. (TR 70, 72.) He added that he took it not knowing that the City would consider his actions to be a

theft and that he pled guilty to misdemeanor theft because he admittedly took it without permission. (TR 72.) Plaintiff further stated that he would not have been able to continue working had he not been suspended and then discharged because he didn't think that he had the mental capacity to do so. (TR 71.)

Plaintiff testified that, prior to his building maintenance supervisor position, he worked as a heavy equipment operator and truck driver for the City of Midland. (TR 49.) He elaborated that the position included road repair, grading, and salting as well as heavy item pick up of brush, concrete piles or blocks, and shingles. (TR 50.) Plaintiff stated that the position required him to lift about 50 to 60 pounds and that he sat for about half of the work day and stood for the other half. (TR 50-51.) He testified that it took him about thirty days to learn the truck driver position for which he had to acquire a commercial driver's license with a Class B endorsement, which he still had as of the hearing date. (TR 51.)

Plaintiff testified that his lower back started bothering him ten years before the date of the hearing and that since April of 2010, he had been experiencing constant, sharp pain which sometimes migrated into his left leg when he agitated it too much. (TR 51-52.) He confirmed that he had not had back surgery. (TR 52.) Plaintiff further testified that his neck problems began in 2004 when he got a herniated disc. (TR 52-53.) He stated that since April of 2010, he had been experiencing burning sensations in his neck, which also bothered his left arm. (TR 53.) He claimed that he was able to use his left arm very little but was still able to perform his job duties. (TR 53.) Plaintiff also testified that he had angina, which was controlled by medicine and did not affect his ability to work. (TR 53.) Plaintiff then confirmed that he has a hearing impairment due to an infection that caused him to lose some hearing in both ears. (TR 53.) He added that he can hear properly in a quiet setting but that his hearing is distorted when he is in a noisy room. (TR 54.)

Plaintiff also admitted to being diagnosed with plantar fasciitis and having $400.00 orthotics in his shoes but that he still had sharp, stabbing pains in his feet. (TR 54-55.) Plaintiff testified that he fractured his ankle in December of 2009, was off work for a while, and then returned to work without restrictions. (TR 55.) He further testified, however, that he had been having problems with his ankle since April of 2010, in that half of his foot was numb and sore. (TR 55.) Next, Plaintiff testified that he had been diagnosed with depression and had been treated for it for three years. (TR 55-56.) He added that he currently took medication for it and had been taking medication for it in April of 2010 as well. (TR 56.) He stated that in April 2010, his depression caused him to suffer from fatigue, depression, and sleeplessness. (TR 56.) Plaintiff also claimed to have an anxiety disorder for ten years for which he took medication, but still did not like to be around people. (TR 56.) Lastly, Plaintiff testified that he was diagnosed with acute asthma ten years prior for which he used an inhaler as needed. (TR 56-57.) He added that humidity, hot weather, and fumes affected his asthma. (TR 57.) Plaintiff then affirmed that he was taking Cymbalta for post-traumatic stress disorder (PTSD) as well as medication for his pain, anxiety, and a sleep disorder. (TR 57-58.) He testified that he experienced dizziness and drowsiness as side effects of his medications. (TR 58.) He further testified to using a cane on occasion for his left ankle pain. (TR 58-59.)

Plaintiff testified that since April of 2010, he could lift and carry 20 to 25 pounds, stand for a half hour, walk 50 yards before his feet start to bother him, and sit for an hour. (TR 59.) He asserted that he could not use his hands or grip things well due to arthritis in his thumbs. (TR 59.) Plaintiff confirmed that he could dress himself, button buttons, zip zippers, and shave. (TR 59-60.) He described his typical day since April of 2010 as "pretty sad." (TR 60.) He said that he got up, turned on the TV, and did nothing. (TR 60.) When prompted by the ALJ, Plaintiff admitted that he helped out with indoor chores, did his laundry, made his bed, and cooked on occasion. (TR 60.)

5

He denied sweeping or vacuuming and said that the neighbor did the outdoor chores. (TR 61.) Plaintiff further stated that he has not taken care of anyone else but himself. (TR 62.) Plaintiff then admitted to smoking one pack per day. (TR 62.) He testified that he had no hobbies, that he sometimes played cards with his mother, and that he hadn't hunted or fished in seven years. (TR 62, 66.)

Plaintiff reiterated that he didn't like to be around people, but he testified that he could go to the store in an emergency. (TR 63.) He also explained that he didn't have to be around the public while working at the library because he would cut through the maintenance rooms. (TR 63.) Plaintiff testified to having five brothers and sisters who (sic) he saw on occasion. (TR 64.) He said that he didn't attend family functions but that he had been leaning pretty hard on one of his brothers. (TR 64.) He admitted to having one friend and that he used to ride along with that friend while he collected scrap metal. (TR 64-65.) He further testified to going to a restaurant during the "quiet time" and stated that he did not attend any religious services or take part in social clubs or classes. (TR 65, 66.) Plaintiff also stated that he had used a computer but did not have one at home. (TR 65-66.)

Plaintiff admitted to having a little bit of trouble with his memory and that he experienced anxiety and panic attacks. (TR 66-67.) He added that he first started experiencing them about five years prior and experienced one weekly since April of 2010. (TR 67.) Plaintiff elaborated that the attacks last for half a day and could be triggered by anything, which he had discussed with his doctors. (TR 67-68.) When asked by the ALJ what kind of work he thought that he could do, Plaintiff responded that he was thinking of driving a truck, or some kind of driving, but he didn't think that he could drive eight hours per day due to his lower back. (TR 68.) He also didn't think that he'd have the concentration to do something like inspect parts for eight hours per day, but he

6

said that he could certainly try. (TR 68.)

Next, Plaintiff was examined at the hearing by his attorney. Plaintiff testified that he had struggled with depression for his whole life, partly because he grew up in a dysfunctional family. (TR 71-72.) Plaintiff claimed that the boiler incident and the termination of his employment significantly affected the degree of his depression. (TR 72-73.) Plaintiff's attorney then referenced a list of impairments that he had sent to Plaintiff's treating psychiatrist, Dr. Cherukuri, and proceeded to question Plaintiff about whether he suffered from the impairments on that list. (TR 73.) Plaintiff admitted to having lost interest in activities such as hunting, fishing, and maintaining friendships. (TR 73.) Plaintiff testified that he didn't leave the house, except for doctor's appointments. (TR 73.) He added that he spent his days sitting on the sofa and pacing the room, that he did not sleep well at night due to anxiety, and that he felt fatigued and dizzy during the day. (TR 73-74.) Plaintiff confirmed that he suffered from an appetite disturbance due to nerves, which resulted in a loss of fifteen pounds. (TR 74.) With regard to psychomotor agitation, Plaintiff testified that he squirms while sitting and his feet are always moving. (TR 74-75.) Plaintiff also testified that he has feelings of guilt or worthlessness. (TR 75.) He stated that he took pride in working and would be working if he could. (TR. 75.) He further testified that he struggled with maintaining concentration or thought process. (TR 75.) Plaintiff added that he could not sit down and read a book all the way through, but he could possibly read a couple of newspaper articles. (TR 75.) Plaintiff further admitted to having thoughts of suicide daily, seeing things, and hearing voices that tell him to kill himself. (TR 76.) Plaintiff also claimed that he has restrictions in daily living in that he just didn't do anything since the boiler incident. (TR 76-77.) With regard to social functioning, Plaintiff stated that he had difficulty socializing with people and that he avoided family functions. (TR 77.) Plaintiff also claimed that he suffered from episodes of decompensation almost

7

daily where he felt like he couldn't function. (TR 77.) He claimed that during these episodes he would cry a lot, just pace through, and have feelings of worthlessness. (TR 77.)

Finally, Plaintiff claimed that he would not be able to work any job at all, even a low stress job, for eight hours per day and five days per week on a regular basis due to lack of concentration, fatigue, and dizziness. (TR 77-78.) He added that he suffered from anxiety and panic attacks once a week that last for half a day, during which he is not able to function but rather sits on the edge of the bed and rocks or paces the room. (TR 78.) He described his panic attacks as feeling "berserk from the inside out," uncontrollable feelings, and not being able to think. (TR 78.)

### B.  Medical Evidence

The undersigned has thoroughly reviewed Plaintiff's medical record. In lieu of summarizing Plaintiff's medical history, the undersigned will make references and citations to the record as necessary in response to the parties' arguments.

### C.  Vocational Expert's Testimony

First, the Vocational Expert (VE) confirmed that her testimony would be consistent with the Dictionary of Occupational Titles (DOT). (TR 79.) Next, the VE identified the regional economy as that of the State of Michigan. (TR 80.) Then, after some clarification from Plaintiff regarding his vocational background, the VE amended her vocational analysis (TR 227) to reflect that Plaintiff performed his job as a maintenance supervisor at the heavy exertional level. (TR 80-82.)

The ALJ then asked the VE whether a hypothetical person of the same age, education, and work experience as Plaintiff, who can lift and carry up to 20 pounds occasionally and 10 pounds frequently; can push and pull up to 10 pounds occasionally; can stand or walk up to six hours out of an eight hour work day; can sit up to six hours out of an eight hour work day with normal breaks; can occasionally climb stairs and ramps, but not ropes, ladders, or scaffolds; can occasionally stoop,

8

kneel, crouch, and crawl; cannot perform overhead work; must avoid concentrated exposure to heat, humidity, cold, gasses, fumes, unprotected heights, and dangerous machinery; whose work environment must not have any loud background noise; and who has no manipulation or visual limitations or limitations with regard to concentration, persistence, or pace but is limited to occasional interaction with coworkers, supervisors, and the public, could perform any of Plaintiff's past relevant work. (TR 82-83.) The VE testified that such an individual could not perform any of Plaintiff's past relevant work. (TR 83.) The VE testified, however, that Plaintiff's general supervisory, coordination, and communication skills from his past relevant work were transferrable, but not to a sedentary occupation. (TR 83.) The VE also testified that there would be other work that the hypothetical individual could perform in unskilled positions at the light exertional level such as (1) a light assembler for which there were approximately 14,000 jobs in the State of Michigan; (2) a packager for which there were about 6,300 jobs in Michigan; and (3) a line attendant for which there would be approximately 4,800 jobs in the State of Michigan. (TR 83-84.)

The ALJ then asked the VE to consider whether there would be any work for a second hypothetical person, assuming all of the conditions of the first hypothetical, but limiting the work to a job with no repetitive bending and twisting at the waist level; no lifting from the floor or ground level to the waist level; and no forceful gripping, grasping, pushing, or pulling; limited to simple, routine, and repetitive tasks involving simple, work-related decisions with few, if any, workplace changes. (TR 84.) The VE testified that such an individual would be able to perform the same positions that she previously identified. (TR 84.) The VE further testified that those positions would exist in the same numbers if a sit/stand option was added to the hypothetical. (TR 85.)

Lastly, the ALJ asked the VE whether there would be any jobs available to the individual from the first two hypothetical questions where the person would be off task 25 percent or more of

any given work day, in addition to the morning and afternoon breaks and lunch hour, and would miss three or more days per month due to ongoing physical and/or mental impairments. (TR 84.) The VE testified that there would be no jobs available to such an individual where the standard for on task versus off task was a maximum of 10-15% off task and for absenteeism was 1-2 absences per month. (TR 84-85.) The VE then confirmed again that her testimony was consistent with the DOT. (TR 85.)

## IV.    ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2014; that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of April 30, 2010; and that Plaintiff suffered from the following severe impairments: lumbar degenerative disc disease, cervical radiculopathy status post resolved disc herniation at C6-C7, hearing impairment, bilateral plantar fasciitis, status post left ankle fracture with open reduction internal fixation, asthma, obesity, depression, anxiety, and post-traumatic stress disorder. (TR 21.) The ALJ also found, however, that Plaintiff's hypertension was non-severe and that his arthritis was not a medically determinable impairment. (TR 21-22.) Additionally, the ALJ found that Plaintiff's impairments did not meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (TR 22-24.) The ALJ then found that Plaintiff had the following residual functional capacity (RFC):

> [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he can push or pull up to 10 pounds occasionally. The claimant can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. He can occasionally stoop, kneel, crouch, or crawl. The claimant can never perform overhead work or forceful gripping, grasping, pushing, or pulling with the bilateral upper extremities. He can never perform repetitive bending and twisting at waist level, and never perform lifting from floor level to waist level. The claimant should avoid concentrated exposure to extremes of temperature and humidity, dusts, gases, and fumes, as well as workplace hazards, such as unprotected heights and

dangerous moving machinery. He should work in an environment free of loud background noise. The claimant is limited to simple, routine, repetitive tasks, involving simple, work-related decisions and few, if any, workplace changes. He can occasionally interact with coworkers, supervisors, and the public.

(TR 25-29.) Subsequently, in reliance on the VE's testimony, the ALJ determined that Plaintiff was capable of performing a significant number of jobs in the national economy. (TR 30-31.) Therefore, the ALJ found that Plaintiff was not disabled under the Social Security Act at any time from April 30, 2010, through the date of the ALJ's decision. (TR 31.)

## V.     LAW AND ANALYSIS

### A.     Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter

differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### B. Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five-step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1) Plaintiff was not presently engaged in substantial gainful employment; and

(2) Plaintiff suffered from a severe impairment; and

(3) the impairment met or was medically equal to a "listed impairment;" or

(4) Plaintiff did not have the residual functional capacity (RFC) to perform relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented Plaintiff from doing past work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education, and past work experience to determine if Plaintiff could perform other work. If not, Plaintiff would be deemed disabled. *See id.* at § 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'"

*Id.* (citations omitted).

### C. Analysis

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)). Under a sentence-four remand, the Court has the authority to "enter upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the [Commissioner], with or without remanding the cause for a hearing. 42 U.S.C. § 405(g). Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration." *Morgan v. Astrue*, 10-207, 2011 WL 2292305, at *8 (E.D.Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174). Plaintiff asserts that this matter should be reversed and remanded under sentence four because the ALJ failed to provide good reason for

assigning only "some weight" to the Listing of Impairments opinion of Plaintiff's treating psychiatrist, Dr. Suma Cherukuri, D.O.[1] (*See* docket no. 12; TR 497-98; TR 24.)

On January 6, 2012, Plaintiff's attorney sent a Listing of Impairments checklist to Dr. Cherukuri and asked that she complete it and return it to his office. (TR 501.) The Listing of Impairments checklist is a two-page document that defines Affective Disorders under § 12.04 of the

---

[1] Plaintiff does not challenge the ALJ's discussion of Dr. Cherukuri's treatment records (TR 481-495) or any weight that the ALJ assigned to Dr. Cherukuri's opinions within those treatment records.

Listing of Impairments and then lists the criteria that a claimant's mental impairments must meet or medically equal for a claimant to be deemed disabled by an Affective Disorder at step three of the Social Security Administration's sequential evaluation process. (TR 497-98; *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04.) Dr. Cherukuri completed, signed, dated, and returned the checklist to Plaintiff's attorney on January 23, 2012. (TR 497-98, 500.) Dr. Cherukuri completed the checklist by placing checkmarks next to certain listed criteria; the document does not contain any written notes or observations. (TR 497-98.) Dr. Cherukuri opined, through her placement of checkmarks, that Plaintiff has a medically documented persistence, either continuous or intermittent, of depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, psychomotor agitation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, and hallucinations which result in a marked restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, and repeated episodes of decompensation, each of extended duration. (TR 497-98.) Plaintiff's

attorney submitted the completed checklist to the Social Security Administration on January 23, 2012, to be marked as an exhibit for use in Plaintiff's claim for disability benefits. (TR 496.)

In step three of the sequential evaluation process, the ALJ determined that Plaintiff's mental impairments did not meet or medically equal the criteria of listing 12.04 or 12.06. (TR 23.) In a particularly thorough discussion, the ALJ considered Plaintiff's testimony and the medical evidence, including Dr. Cherukuri's treatment notes, and concluded that Plaintiff has only a mild restriction in activities of daily living, moderate difficulties in social functioning, and moderate difficulties with

14

regard to concentration, persistence, and pace, with no episodes of decompensation. (TR 23-24.)

The ALJ then discussed Dr. Cherukuri's Listing of Impairments opinion:

> In January 2012, Dr. Cherukuri reported that the claimant had a depressive syndrome characterized by anhedonia, appetite disturbance, sleep disturbance, difficulty concentrating, and hallucination[s], among other symptoms (Ex. 17F/2). Additionally, Dr. Cherukuri observed that the claimant's depression cause [sic] marked limitations in activities of daily living, social functioning, and concentration persistence, or pace, along with repeated episodes of decompensation (Ex. 17F/3). The undersigned has given Dr. Cherukuri's opinion some weight regarding the nature and persistence of the claimant's depressive symptoms. However, the record does not support the degree of limitation reported with respect to the "paragraph B" criteria. In particular, as noted above, there is no evidence of any episode of decompensation during the relevant period.

(TR 24.)

The ALJ must give a treating physician's opinion complete deference if it is supported by clinical and laboratory diagnostic evidence and it is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). It is equally well settled that the ultimate issue of disability is reserved to the Commissioner and not the treating or examining physician. *Kidd v. Comm'r*, 283 Fed. Appx. 336, 341 (6th Cir. 2008). Thus, when a medical or non-medical source offers an opinion on "an issue reserved to the Commissioner, such as whether the claimant is disabled, the ALJ need not accord that opinion controlling weight." *Id.* (citing *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007)). The opinion of an examining source is generally accorded more weight than is the opinion of a source who did not examine the claimant. 20 C.F.R. § 404.1527(c)(1). The opinion of a state agency medical or psychological consultant is reviewed in the same manner as is the opinion of a nonexamining physician or psychologist. 20 C.F.R. §404.1527(e).

The Commissioner requires its ALJs to "always give good reasons in [their] notice of determination or decision for the weight [they] give [a] treating source's opinion." 20 C.F.R. §

15

404.1527(c)(2). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson v. Comm'r*, 378 F.3d 541, 544 (6th Cir. 2004) (citing Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *5 (1996)). If the opinion of a treating source is not afforded controlling weight, an ALJ must apply certain factors in determining what weight to give the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson*, 378 F.3d at 544 (citation omitted). Even then, a finding that a treating-source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected. Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *4.

Additionally, the Sixth Circuit has upheld the decision of an ALJ which gave less than controlling weight to a treating physician without specifically analyzing the factors set forth in 20 C.F.R. § 404.1527(c) where the ALJ provided "good reason" for the decision. *See Infantado v. Astrue*, 263 Fed.Appx. 469, 473-74 (6th Cir. 2008). There is no per se rule that requires an articulation of each of the six regulatory factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). *Norris v. Comm'r*, No. 11-11974, 2012 WL 3584664, at *5 (E.D. Mich. Aug. 20, 2012) (citing *Tilley v. Comm'r*, 394 Fed. Appx. 216, 222 (6th Cir. 2010)). Moreover, an ALJ's failure to discuss the factors of § 1527(c)(2)-(6) may constitute harmless error (1) if "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner

16

adopts the opinion of the treating source or makes findings consistent with the opinion;" or (3) "where the Commissioner has met the goal of [Section 1527(c)]—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Nelson v. Comm'r*, 195 Fed. Appx. 462, 470 (6th Cir. 2006) (citing *Wilson*, 378 F.3d at 547).

Plaintiff is correct that the ALJ failed to give good reason for the weight he afforded to Dr. Cherukuri's Listing of Impairments opinion, as the ALJ's statement that "the record does not support the degree of limitation reported with respect to the 'paragraph B' criteria" is not sufficiently specific to explain the reasoning behind the decision. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 245-46 (6th Cir. 2007) (An ALJ's explanation that "the record does not support the limitations of the severity suggested by [the claimant's treating physician]" is inadequate to satisfy the notice requirement discussed in Social Security Ruling (SSR) 96-7p.).

Nevertheless, the ALJ's failure to provide good reason for discounting Dr. Cherukuri's Listing of Impairments opinion is harmless error. Here, Dr. Cherukuri's opinion consists solely of checkmarks without any supporting explanation or reference to her treatment records. (TR 497-98.) Defendant argues that the lack of clinical and objective findings in support of the opinion is fatal. (*See* docket no. 16 at 9-10 (citing SSR 96-2p; *Price v. Comm'r of Soc. Sec.*, 342 F.App'x 172, 175-77 (6th Cir. 2009)).) The undersigned agrees. "An opinion may be patently deficient if the treating source offers no explanation to support it." *Fleming v. Comm'r of Soc. Sec.,* Case No. 4:10-CV-25, 2011 WL 3049146 at *9 (E.D. Tenn. Jul. 5, 2011) (citing *May v. Astrue,* Case No. 3:09cv00090, 2009 WL 4716033 at *8 (S.D. Ohio Dec. 9, 2009)) (finding treating source opinion patently deficient where treating source simply checked boxes about the plaintiff's alleged disability and failed to provide supporting explanations or objective evidence). *See also Carr v. Comm'r of Soc. Sec.*, No. 12-cv-14426, 2013 WL 5775391, at *12 (E.D. Mich. Oct. 25, 2013) (Borman, J.) (adopting

17

Report and Recommendation of Binder, M.J.) (citing *Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir.2011) (holding that ALJ properly discounted doctor's opinions on a check-off form which "did not cite clinical test results, observations, or other objective findings as a basis for determining [the plaintiff's] capabilities"); *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir.2010) (holding that the ALJ properly discounted the treating physician's opinion that consisted of checklist forms which cited no medical evidence and provided little or no elaboration). Accordingly, the undersigned finds that Dr. Cherukuri's opinion is patently deficient and that the ALJ's error is not subject to remand. The ALJ's disability determination is supported by substantial evidence and should not be disturbed.

## VI.    CONCLUSION

For the reasons stated herein, the undersigned recommends that Plaintiff's Motion for Summary Judgment (docket no. 12) be DENIED and Defendant's Motion for Summary Judgment (docket no. 16) be GRANTED.

## REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to

Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: August 6, 2014          s/ Mona K. Majzoub
                               MONA K. MAJZOUB
                               UNITED STATES MAGISTRATE JUDGE

## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: August 6, 2014          s/ Lisa C. Bartlett
                               Case Manager